Jones, Chief Judge,
delivered the opinion of the court.:
In this suit the plaintiff, an Argentine corporation, seeks to recover from the United States payment for approximately 2,000 tons of lamb carcasses and lamb cuts purchased by the United v States Department of Agriculture under *705 Lend-Lease authority for transfer to the United Kingdom in the year 1942. [55 Stat. 31.]
The plaintiff sues for the sum of $886,260.60, together with accruing exchange commissions, interest, costs and other charges. The plaintiff was tendered the sum of $409,695. The parties were unable to agree upon the amount that should be paid. Hence this suit.
The facts are set out in detail in the court’s findings.
For many years all nations have recognized the necessity for quarantine laws and regulations to protect human beings, animals and plants from the spread of disease. Sometimes these laws and regulations are used as a smokescreen to prevent unwanted competition, but all nations have recognized the necessity for such laws and regulations when conditions justified such action.
Many years ago the Department of Agriculture was authorized by law to designate any foreign country or region where diseases dangerous to animals existed, and to prohibit the importation of animals and meats from those countries or regions, leaving other countries or unaffected regions of any country free to engage in shipments to the United States. Section 306 (a), Title 3 of the Tariff Act of 1930, 46 Stat. 689, reads as follows:
(a) Rinderpest and foot-and-mouth disease. — If the Secretary of Agriculture determines that rinderpest or foot-and-mouth disease exists in any foreign country, he shall officially notify the Secretary of the Treasury and give public notice thereof, and thereafter, and until the Secretary of Agriculture gives notice in a similar manner that such disease no longer exists in such foreign country, the importation into the United States of cattle, sheep, or other domestic ruminants, or swine, or ox fresh, chilled, or frozen beef, veal, mutton, lamb, or pork, from^ such foreign country, is prohibited.
This provision of the law was in effect during the period when the series of events involved in this controversy took place.
Foot-and-mouth disease is defined as an acute contagious febrile disease affecting especially cloven-footed animals caused by a filtrable virus and characterized by ulcerating vesicles in the mouth, about the hooves and around the *706 udder. It is shown to be communicable by mals or by meats, frozen or otherwise. It is a very serious disease and does great injury to livestock. Once it gains a foothold it is extremely difficult to stamp out. The official records show that the one known sure way to stop the contagion is to kill the affected animals and bury the carcasses and clean up the premises. The disease is frequently transmitted through particles of meat that go into garbage which is fed to swine or other animals, or from the droppings in barns and feedlots.
For many years a quarantine against the importation of certain animals, including sheep and the products thereof, into the United States from certain areas of South America, had been in effect. Efforts were made from time to time to have the embargo lifted as to certain parts of the Argentine Eepublic which claimed to be free of the disease. Tierra del Fuego claimed it was free of the disease among its sheep, and that it had been for a number of years prior to 1941. It asked that it be treated as a separate country and the embargo lifted.
The portion of the Argentine Eepublic in which there was the greatest production of sheep during the period involved lies in the area known as Patagonia, which embraces that part of the continent of South America lying south of the 42d parallel and including Tierra del Fuego. Tierra del Fuego is a series of islands at the south end of America, separated from the mainland by the Strait of Magellan.
After some discussion with the officials of the two countries it was agreed that the Attorney General would be asked for an interpretation of the statute and the authority of the Secretary under it.
In response to a request by the Secretary of Agriculture for an opinion as to whether Tierra del Fuego might be regarded as a country separate from the continental Chilean and Argentine area within the meaning of Section 806 (a) quoted above, the Attorney General of the United States replied that having in mind the purpose of the statute, if the Secretary of Agriculture found that the disease did not exist .in Tierra del Fuego, and if the geographical separation was sufficient to avoid the risk of introduction of the disease, *707 it was his opinion that it was within the discretion of the Secretary to treat Tierra del Fuego as a separate area. On June 16, 1941, the Secretary of Agriculture wrote to the Secretary of the Treasury transmitting a copy of the opinion of the Attorney General, and stating that
■However, because the Attorney General’s opinion referred to above states that Tierra del Fuego may not necessarily be included as part of Argentina for the purpose of the administration of Section 306 (a) of the Tariff Act, and in view of the fact that this Department has no reason to believe that either rinderpest or foot-and-mouth disease exists in Tierra del Fuego, the prohibition is not applicable to the specified animal or animal products imported from that territory.
This Department’s inspectors at the ports of entry are being advised accordingly.
On the same day the Secretary of Agriculture wrote to the Secretary of State reciting these facts and stating that he would interpose no objection to the importation of fresh, chilled, or frozen meat from Tierra del Fuego, provided it be subject to the following two conditions:
(1) the meat be derived from animals grown in Tierra del Fuego and slaughtered and dressed in that territory under National Government Inspection, and
(2) the meat be shipped by direct boat from Tierra del Fuego to the United States; that is to say, that no meat will be transferred from one ship to another en route from Tierra del Fuego to the United States. This would not, of course, prevent the entry of such boats into intermediate ports for supplies.
On June 18, 1941, the Acting Secretary of State of the United States wrote to the Argentine Ambassador outlining these facts and stating that the Department of Agriculture had no reason to believe that the foot-and-mouth disease existed in Tierra del Fuego, and would interpose no objection to the entry into the United States of fresh, chilled, or frozen meat, from that country, subject to the requirements set out above. The Argentine Ambassador informed his government of this action and the matter was given publicity in Argentina.
The general manager of the plaintiff corporation and a member of its Board of Directors had come to the United *708 States in February 1941 for the purpose of doing everything possible to obtain a favorable decision on the part of the Attorney General and the Department of Agriculture with reference to the importation of meat from Tierra del Fuego and to make a careful inquiry concerning possible markets in the United States for the disposal of frozen and quick-frozen lamb and mutton.
The Argentine producers were familiar with the exportation of frozen whole carcasses as this is the form in which all their shipments of lamb and mutton to Great Britain were made. However, the process of quick-freezing meats was unknown in Argentina and no frigorificos there were at that time equipped to manufacture the packaged, wrapped, and boxed quick-frozen cuts.
On account of the lack of equipment the corporation would not be able to produce during the first season enough quick-frozen lamb cuts to make a complete shipload, and it was planned to produce as many of these cuts as possible, and to complete the ship’s cargo with whole frozen carcasses. It was the plan to sell the quick-frozen lamb cuts in the United States, but to put the whole frozen carcasses in bond and sell them for ship’s stores and to the Caribbean markets in order to avoid the necessity of paying customs duties.
These preliminary plans were made in anticipation of getting the quarantine lifted on the products from Tierra del Fuego.
On June 30, 1941, in reliance on the assurance that the meat would be admitted to the United States, the corporation exercised its option to purchase a frigorifico in Tierra del Fuego and began at once to prepare the plant for the quick-freezing of lamb cuts to be sent to the United States.
Experts were employed and special types of wrapping paper and boxes were purchased in order to produce the cuts on the basis of studies made by plaintifi’s officials in the United States.
Soon after the Attorney General’s opinion of May 16,1941, was made public, objection to the anticipated importation of frozen meats from Tierra del Fuego developed among the livestock interests in the United States, and a member of the United States Senate, as well as other persons in this *709 country, questioned the soundness of the Attorney General’s opinion.
On July 15, 1941, the Undersecretary of the Department of Agriculture wrote to the Secretary of the Treasury asking that the Bureau of Customs hold in abeyance the importation of meats from Tierra del Fuego in view of the fact that the Department of Agriculture felt it necessary to determine “presently whether or not the purpose of the statute to avoid the risk of introduction of foot-and-mouth disease into this country could be adequately served if the prohibition in Section 306 (a) is no longer applied to animals or their products from Tierra del Fuego.” The Secretary of the Treasury agreed to comply with this request, but information of this action was not conveyed to the Argentine Government or to the plaintiff.
The Secretary of Agriculture began an investigation for the purpose of determining whether a foreseeable risk of the introduction of the disease was involved, and sent Dr. Fladness from the Bureau of Animal Industry to Tierra del Fuego with instructions to make an investigation and report to the Secretary at the earliest possible moment. Dr. Fladness arrived in Tierra del Fuego on Monday, December 29, 1941, and spent two or three weeks in that area, and after such investigation reported his conclusion that foot-and-mouth disease did not exist on the island of Tierra del Fuego. He further stated that the possibility of infection in that area through local movements of livestock or through land movements from central Argentina or Chile were considered remote; that a more dangerous possibility was involved in the shipment of susceptible animals by water from an infected region to the island or to some point on the mainland side of the straits. He ended the report with this statement:
The fidelity with which such control is likely to be exercised in all cases is a doubtful factor. This writer’s knowledge of tendencies along that line is not such as to inspire confidence that prescribed measures will be applied in a mamier to provide all possible protection.
The slaughter of the sheep and lambs and the freezing and packing of the meat involved in the present action com *710 menced in February and was completed about the end of April 1942, The shipment was to include 2,744,141 pounds of carcasses telescoped, 671,894 pounds of carcasses whole, and 619,409 pounds of quick-frozen cuts.
The plaintiff corporation chartered a steamship for the shipment from Tierra del Fuego to New York, the final negotiations being completed on May 15,1942. The flat transportation rate was to be 6% cents per pound.
Prior to the chartering of the ship and owing to the delay in announcing findings based upon the investigation of Dr. Fladness, the Argentine Ambassador and the corporation’s representative in New York on March 6,1942, conferred with the Secretary of Agriculture and his Director of Foreign Agricultural Relations. The Secretary stated that he was not in position at that time to make a final determination, but that in the event the meat was not admitted to the United States he would make every effort to secure a market for it either through the armed forces or through Lend-Lease operations.
The Under Secretary of State, Sumner Welles, did not testify, but in a letter dated July 22, 1948, he stated his recollection of the events and it was stipulated by the litigants that if he had been called as a witness he would have testified along the lines set out in that letter. The letter indicates that he was deeply disturbed at the turn of events in early March 1942, and believed that the ultimate decision of the Department of Agriculture, if unfavorable, would have a highly prejudicial effect upon Argentine-American relations. He states that he took the matter up with President Roosevelt, that the President suggested that the Government of the United States purchase the shipment already in progress, and stated that since the Argentinians had commenced operations in reliance upon official approval given by the Government of the United States, they should at least not be permitted to suffer any loss as a result of this Government’s reversal of position. Mr. Welles states that he conveyed this information and the statement of the President to the Argentine Ambassador.
On March 21, 1942, the Secretary of Agriculture, in response to an inquiry from the Undersecretary of State, re *711 plied that Dr. Fladness and the Agricultural Attache -in Buenos Aires had spent 15 days in Tierra del Fuego and areas contiguous thereto, and that the matter contained in the report of Dr. Fladness and the difficulties of guarding against the spread of foot-and-mouth disease in wartime had led him to believe that the importation of fresh, chilled or frozen meats from Tierra del Fuego into the United States would involve a foreseeable risk of the introduction into this country of foot-and-mouth disease, and that Tierra del Fuego should not be considered a separate country under the provisions of Section 306 (a) of the Tariff Act of 1930.
On the same day, March 21, 1942, the Secretary of Agriculture wrote to the Undersecretary of State that the Department of Agriculture was prepared to purchase 2,000 tons of Tierra del Fuego mutton f. o. b. Buenos Aires, under Lend-Lease authority for transfer to the United Kingdom.
On May 22,1942, the Undersecretary of State of the United States wrote to the Argentine Ambassador conveying the information as to the decision of the Secretary of Agriculture and the reason therefor. He further stated in his letter the following:
In view of the need for immediate disposition of this Tierra del Fuego mutton, it is therefore proposed that, if your Government so desires, the Department of Agriculture purchase up to 2,000 tons of Tierra del Fuego mutton f. o. b. Buenos Aires for disposition abroad.
Plaintiff accepted the offer of the United States Government to buy the meat.
This offer and acceptance constitute the contract which the United States Government made and furnishes the basis of this court’s jurisdiction to allow recovery for the value of the meat purchased.
It is the contention of the plaintiff that by the terms of this contract, construed in the light of the background of discussions between the various officials, the Government of the United States became obligated not only to purchase the meat, but to pay all the expenses incurred by the plaintiff in installing machinery, hiring experts, and all other items of expense incurred by the plaintiff in the entire transaction.
It is the contention of the defendant that the United States *712 Government simply purchased the meat for Lend-Lease and that the price to be paid should be governed by the prices which the United Kingdom was currently paying for similar types of meat that were then being shipped from Argentina to the British Government, the United Kingdom at that time being the principal export outlet for Argentine lamb and mutton.
There had been no agreement as to the exact price which the United States was to pay for the meat or as to a method by which the price was to be determined.
Two conferences arranged by the Argentine Embassy in Washington were held in the Department of Agriculture in June 1942 with regard to the disposition of the 2,000 tons of meat. The first meeting was attended by officials of the Department of Agriculture, the Lend-Lease Administration, the Department of State, the Argentine Embassy and the manager of the New York office of the plaintiff.
The plaintiff’s representative, upon instructions from Buenos Aires, stated that the price of the meat to the United States Government would be 16% cents per pound for the frozen carcasses and 29% cents per pound for the quick-frozen lamb cuts, f. o. b. Buenos Aires.
Having decided that the meat would go to Great Britain, the Department of Agriculture sent to the British Food Mission a communication dated June 11, 1942, in which it was stated that the Department was prepared to make payment to the Argentine owners on the basis of the Ministry of Food’s negotiations and to transfer the product to the United Kingdom under Lend-Lease regulations.
Subsequently representatives of the United States Government, the British Food Mission, the Argentine Embassy, the plaintiff and a general representative of the Argentine Meat Board in Europe met at the Department of Agriculture. At this meeting it was suggested on behalf of the United States that the plaintiff negotiate with the British Ministry of Food in London in regard to the price to be paid for the meat because the British had had much experience in the purchase of Argentine meat and were therefore qualified to represent the United States Government in such negotiations as experts.
*713 After going over the matter the British Ministry of Food determined that the value of the meat was $409,695. Accordingly the United States Government offered to pay that amount in full settlement of plaintiff’s claim. Plaintiff was unwilling to accept this amount in full settlement and no payment has been made of any part of the claim.
There is no evidence of the actual cost of the production of the products here involved. However, a number of items of expense incurred by the plaintiff are set out in its claim and it asserts that these should be added to the then current sale price of the meat and the amount of the entire claim should be paid by the United States Government.
We are unable to find within the four corners of the actual contract any agreement to pay these additional sums. It is clear from the offer and acceptance that the Government undertook to purchase the meat under the Lend-Lease program and it is certainly obligated to pay the then current value of the meat thus purchased. Under our jurisdiction we are not authorized to go beyond the terms of the contract as it was finally entered into.
The plaintiff claims the value of first quality lamb under the United Kingdom agreement, f. o. b. Patagonia port, plus the following items: freight and transfer costs, selecting and grading carcasses, one-sixth of the costs of quick-freeze installation, employment of a quick-freeze expert from the United States, direct labor and materials employed in preparing quick-frozen cuts, carcass value of weight loss in processing boneless cuts, travel expenses of a technical engineer and officials in connection with the quick-freeze operations, tax on theoretical negotiation of exchange contracts, sales tax and stamps, expenses for survey of American market, interest paid by plaintiff to November 23,1947, and charges on exchange contracts. The total amount of the claim and all items on the bill rendered aggregates $1,123,765.61.
Many of these items cannot be allowed by this court under the terms of the actual contract that was entered into. Some of these costs were incurred in anticipation of a possible market rather than in any direct preparation of the meat involved in this shipment. The defendant, however, con *714 cedes that there are certain items which should be allowed in addition to the price indicated in the findings of the British Food Mission. Among other items is one of freight. This particular purchase of meat by the United States contemplated a delivery f. o. b. Buenos Aires. At the negotiations in London the British estimated that the charges for this freight would be approximately $30,732.96. As a matter of fact, however, the plaintiff had chartered a ship, agreeing to pay a flat rate of 6% cents per pound on the meat which was to be shipped from Argentina to the United States. Since the destination was changed from the United States to Buenos Aires where the meat was to be delivered to the British ships, the best settlement which the plaintiff was able to secure from the charter company was 3cents per pound for the shorter shipment, and plaintiff paid a total of $150,080.46 as freight to Buenos Aires, plus a 2% pension fund tax of $4,001.61. The defendant further concedes the items of insurance on the shipment and transfer and inspection costs at Buenos Aires which were paid by plaintiff in the additional sum of $12,975.53.
This ship was finally chartered on May 22,1942, more than two months after it became very doubtful that the meat would be admitted to the United States, and hence there arises some question as to the propriety of allowing the full cost of the chartering of the ship as a part of the contract. However, this expense was actually incurred and paid, and since the defendant practically conceded that it probably should be allowed, and since it was incurred in carrying out the actual shipment of the meat that was finally delivered, we have concluded that it would be reasonable to include these items in the amount to be paid under the contract.
Some of the frozen carcasses were from larger sheep and weighed in excess of 35 pounds. The British classed them as second quality because of the British preference for smaller sizes. Since this preference does not exist elsewhere, the fair price for this particular meat which included 303,-•197 pounds, should be increased by the sum of $953.56. In addition the defendant admits that the packaged and quick-frozen cuts were not desired in England, and were unknown on the British market. A careful calculation was made by *715 the trial Commissioner wbicli appears both to the representatives of the defendant and to this court as reflecting a fair price for the quick-frozen cuts in Buenos Aires, and we have concluded that the price of these particular cuts as set out in finding 41 should be increased 27,86 percent. This involves 619,409 pounds.
These additional items bring the total to be paid for the meat to $557,761.11.
We regard this as a generous allowance for these products in the circumstances. However, in view of the background of negotiations and some misunderstanding, we feel that, everything considered, this amount should be allowed.
As further evidence of the fairness of this conclusion we call attention to the fact that the initial steps were taken by the Argentinians. There was no meat shortage in 1941 and early 1942. That came later in the war period when production was interrupted in many parts of the world. The people who were directly interested in the shipment at that time were the livestock producers of Argentina who were seeking an outlet for their large production. We were not asking for the meat. In considering any effort to broaden the language of the actual contract by reading into it the background of negotiations and individual statements these conditions must be remembered in order to have a complete picture.
For many years Argentina had been cut off from the American market and naturally the officials of that government were anxious to secure access to this market. This is not offered in criticism, but as a factual comment. For many years they had endeavored to secure the lifting of the embargo. When it became evident that the embargo might be lifted, they began to make preparations to be ready for the market. Some of the items of expense were incurred in anticipation. A good portion of the meat involved in this suit was slaughtered after it became apparent on March 12, 1942 that there was serious doubt as to whether the meat would be admitted. Nevertheless plaintiff proceeded in the hope that the final decision would be favorable. It is because of these steps that we have made the addition of some of the items listed above which would otherwise be doubtful, but the effort to read into the terms of the contract- that-the *716 Argentine owner would be saved and kept harmless from any and all of its investments and speculative losses goes far beyond what would be construed just and fair even in international relations. We do not think the contract calls for the inclusion of these items..
The plaintiff is entitled to recover the sum of $557,761.11.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.